SEDGWICK LLP
MARTIN J. O'LEARY  Bar No. 106546
BRIAN D. HARRISON  Bar No. 157123
333 Bush Street, 30th Floor
San Francisco, California  94104
Telephone: (415) 781-7900
Facsimile:  (415) 781-2635
Email:  *martin.o'leary@sedgwicklaw.com*
          *brian.harrison@sedgwicklaw.com*

Attorneys for Plaintiff
FEDERAL INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL INSURANCE COMPANY, an Indiana corporation,<br><br>Plaintiff,<br><br>v.<br><br>ALETHEIA RESEARCH & MANAGEMENT, INC., a California corporation,<br><br>Defendant. | CASE NO. CV 11-08920 RGK (PLAx)<br><br>FEDERAL INSURANCE COMPANY'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; REQUEST UNDER RULE 56(D)<br><br>Date:        June 4, 2012<br>Time:        9:00 am<br>Dept.:       850<br>Judge:      Hon. R. Gary Klausner |

**REDACTED VERSION**

SF/2719577v3

FEDERAL'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................1

II.  ADDITIONAL UNCONTROVERTED MATERIAL FACTS ........................3

   A.   HCC's Primary Policy and Federal's Excess Policy ..............................3

      1.   HCC's Primary Policy ...................................................................3

         a.   Definition of "Loss" .........................................................3

         b.   Exclusion for Liability Arising Out of Contract ...............4

         c.   Ill-Gotten Gains Exclusion................................................4

      2.   Federal's Excess Policy ...................................................................4

   B.   Background ..............................................................................................4

      1.   Boskovich Acquired a Total of 500 Shares of Stock Prior to and During His Employment with Aletheia.........................................4

      2.   Sale of Aletheia Shares at Market Value.........................................5

      3.   Aletheia Terminates Boskovich and Attempts to Buy Boskovich's Shares at Book Value.......................................................................6

   C.   The Boskovich Action ..............................................................................6

   D.   HCC and Federal Reserve Rights as to the Boskovich Action and HCC Reimburses Defense Costs Under the Primary Policy ............................7

   E.   Settlement of the Boskovich Action ........................................................8

   F.   The Coverage Action................................................................................9

III. ARGUMENT ......................................................................................................9

   A.   Aletheia Has Failed to Meet its Burden of Proving Facts That Bring the Settlement Payment Within Coverage .....................................................9

   B.   Aletheia's Motion Is Based Upon a Misunderstanding of the Relevant Law Regarding the Obligations and Duties of an Insurer ........................9

   C.   Coverage Does Not Exist for the Settlement Payment Because It Does Not Constitute Insurable Loss.................................................................12

      1.   The Settlement Payment Is Uncovered Restitution Because It Represents Amounts that Boskovich Was Entitled to in the First Instance, Which Is Not Insurable .................................................12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.      ███████ rit to Aletheia's Argument that Boskovich's ██████ was Part of the Settlement of Both Boskovich's Claims ................................................................15

3.      The Case Law Cited by Aletheia Confirms that Public Policy Bars Coverage for the Settlement Payment .........................................16

D.      The Settlement Payment Is Barred by the Policies' Exclusions ...........17

1.      The Settlement Constitutes Liability Arising Under Contract Which Is Barred From Coverage Under Exclusion G. ...............17

2.      Coverage Is Barred Under Exclusion E. ....................................18

IV.     ALETHEIA CANNOT RE-ARGUE THAT "FEDERAL SHOULD BE BOUND BY HCC'S ADMISSION OF COVERAGE" BECAUSE ALETHEIA RAISED THIS ISSUE IN ITS MOTION TO DISMISS AND THE COURT DETERMINED THAT FEDERAL PROPERLY RESERVED AND STATED A CLAIM FOR REIMBURSMENT ...............................................................19

V.      PROCEDURAL ISSUES REGARDING ALETHEIA'S MOTION ..............20

VI.     FEDERAL'S RULE 56(D) MOTION..................................................20

VII.    CONCLUSION ........................................................................20

# TABLE OF AUTHORITIES

Page

## Cases

*AIU Ins. Co. v. Super. Ct.*
51 Cal.3d 807 (1990)...................................................................................17

*Aydin v. First State Ins. Co.*
18 Cal.4th 1183 (1998)...................................................................................9

*Bank of the West v. Super. Ct.*
2 Cal.4th 1254 (1992).............................................................................10, 12

*Blue Ridge Ins. Co. v. Jacobsen*
25 Cal.4th 489 (2001)...............................................................................2, 10

*Buss v. Super. Ct.*
16 Cal.4th 35 (1997)......................................................................................10

*Chubb Custom Insurance Co. v. Grange Mutual Casualty. Co.*
No. 2:07-cv-1285, 2011 U.S. Dist. LEXIS 111583 (S.D. Ohio Sept. 29, 2011)....11

*Federal Insurance Co. v. Arthur Andersen, LLP*
No. 03 C 1174, 2005 U.S. Dist. LEXIS 15706 (N.D. Ill. Aug. 2, 2005)...............11

*Genzyme Corp. v. Federal Insurance Co.*
622 F.3d 62 (1st Cir. 2010) ..........................................................................11

*Gray v. Zurich Ins. Co.*
65 Cal.2d 263 (1966).....................................................................................10

*Jaffe v. Cranford Insurance Co.*
168 Cal.App.3d 930 (1985)...........................................................................17

*Krasner v. Prof'l Prototype I. Ins. Co.*
No. 91-55985, 1993 U.S. App. LEXIS 564 (9th Cir. Jan. 13, 1993).....................17

*Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*
272 F.3d 908 (7th Cir. 2001).............................................................10, 12, 13

*Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.*
10 Cal.4th 645 (1995)....................................................................................10

*Pan Pac. Retail Props., Inc. v. Gulf Ins. Co.*
471 F.3d 961 (9th Cir. 2006).............................................................12, 13, 14

*State Farm Fire & Cas. Co. v. Super. Ct.*
191 Cal.App.3d 74 (1987)............................................................................17

*United Western Grocers, Inc. v. Twin City Fire Insurance Co.*
457 F.3d 1106 (9th Cir. 2006).......................................................................11

## Statutes

Fed. R. Civ. P. 56 (d) ...................................................................................20

I.    **INTRODUCTION**

In this action, Plaintiff Federal Insurance Company ("Federal") seeks reimbursement of the amount it paid to compromise and settle the Boskovich Action brought against its insured, Defendant Aletheia Research & Management, Inc. ("Aletheia").  Boskovich claimed that his employment with Aletheia was terminated as a pretext so that the defendants in the Boskovich Action—Aletheia and its directors and officers, Peter Eichler and Roger Peikin—could obtain his shares of Aletheia stock for less than fair market value.  Boskovich would not have had a substantial claim for loss of income because he started his own investment firm shortly after he left Aletheia and paid himself an annual salary of $500,000.  ███████████████████

███████████████████████████

The Boskovich Action settled shortly before trial for ███████████ which included a $5 million policy limits payment by Federal under its Excess Policy ("Settlement Payment").  This settlement amount was a compromise ██████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████  In essence, this settlement was a compromise of a dispute over the amount that Boskovich was entitled to under his contract but for Aletheia's alleged wrongful conduct.

There is no coverage for the Settlement Payment under the Excess Policy, which follows the form of the Primary Policy, because Loss does not include "the return or restitution of any money, assets or personal profit received by any Insured to which such Insured is not legally entitled" or "matters deemed uninsurable under the law pursuant to which this Policy shall be construed."  Also, the Excess Policy does not cover amounts that Boskovich was entitled to under contract because the recovery of monies arising under a contract are expressly excluded.[1]

Although the Settlement Payment is not covered, Federal did exactly what it is

---

[1] There is also an exclusion for ill-gotten gains that would apply.

was required to do under *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal.4th 489, 498 (2001) – protect Aletheia by settling the Boskovich Action under a reservation of rights and then bring this declaratory relief and reimbursement action with respect to the outstanding coverage dispute.  As this Court held in its February 6, 2012 Order Re: Defendant's Motion to Dismiss (ECF No. 41), Federal met the requirements of *Blue Ridge* when, at Aletheia's request and in response to a demand to settle for the limits of the Excess Policy, Federal agreed to contribute its policy limit towards the settlement of the Boskovich Action and timely reserved rights.

Federal intends to file a motion for summary judgment at its earliest opportunity. Before doing so, it wants to review and evaluate the pleadings, written discovery, deposition transcripts and exhibits, party documents, documents produced by third parties in response to subpoenas, and expert reports from the Underlying Action, to evaluate the evidence that may support its claim for reimbursement.  So far, Aletheia has only produced documents that were not marked "Confidential" in the Underlying Actions.  It has refused to produce approximately 30,000 documents marked "Confidential" because it purportedly fears a violation of the protective order in the Underlying Actions.  To date, Federal's efforts to resolve this discovery dispute have been unsuccessful.  Once Federal receives and reviews all documents marked "Confidential" in the Underlying Actions, it will file its motion for summary judgment. If Aletheia cooperates, this filing will be soon.

Here, Aletheia has filed a hasty motion for summary judgment which, in large part, is based on inadmissible hearsay statements made at a confidential mediation and the opinions of Aletheia's counsel set forth in a declaration, to try to draw a quick ruling from the Court without providing Federal with a fair opportunity to review the evidence in the Underlying Actions to be able to advance its own motion for summary judgment or to prepare its strongest opposition to Aletheia's motion.  The quick filing of this motion after Aletheia's counsel signed a Joint Status Report representing that the parties will file cross-motions for summary judgment is a questionable litigation

tactic.  Further, what is remarkable about Aletheia's motion is that it does not cite to, rely upon or discuss a single piece of evidence from the Underlying Action, and it is based on an improper argument that because Boskovich's complaint alleged wrongful termination and damages, the Settlement Payment must be covered.   This approach defies logic and reason, and begs the question:  What evidence may Aletheia be hiding under its cloak of confidentiality?  Regardless, Aletheia's motion must fail because it does not comprehend the rights and duties of an insurer under California law and relies on irrelevant (and largely inadmissible) facts.  Further, the additional uncontroverted facts that Federal submits in support of this opposition and demonstrate that Aletheia's conclusionary statements lack evidentiary support.

Finally, Federal respectfully points out that Aletheia ignored this Court's twenty page limit for motions and failed to meet and confer with counsel under Local Rule 7-3.

For these reasons, Aletheia's motion for summary judgment must be denied.

## II.   ADDITIONAL UNCONTROVERTED MATERIAL FACTS

### A.   HCC's Primary Policy and Federal's Excess Policy

Houston Casualty Company ("HCC") issued a primary policy to Aletheia for the period from January 30, 2008 to January 30, 2009 ("Primary Policy").  The Limit of Liability is $5 million; defense costs paid reduce the limit.  (AUMF No. 16.)

Federal issued an excess policy to Aletheia for the period, by endorsement, from January 30, 2008 to March 1, 2009 ("Excess Policy").  The Limit of Liability is $5 million.  (AUMF No. 17.)

#### 1.   HCC's Primary Policy

##### a.   Definition of "Loss"

All of the Insuring Agreements (subject to other terms and conditions) cover "Loss."  (AUMF Nos. 19, 20.)  "Loss" means, in part:

Loss means damages, judgments, settlements and Costs, Charges and Expenses incurred by the Insured(s) []; however, Loss shall not include: []

(3)     matters deemed uninsurable under the law pursuant to which this Policy

        shall be construed; []

(7)     the return or restitution of any money, assets or personal profit received

        by any Insured(s) to which such Insured(s) is not legally entitled[.]

        (AUMF No. 18.)

### b.     Exclusion for Liability Arising Out of Contract

Exclusion G. bars coverage for payment in connection with any Claim:

for the liability of any Insured(s) arising under any contract or agreement,
regardless of whether such liability is direct or assumed; provided, however,
this exclusion shall not apply . . . to liability which would attach to any
Insured(s) even in the absence of a contract or agreement.  (AUMF No. 21.)

### c.     Ill-Gotten Gains Exclusion

Exclusion E., as amended by Endorsement No. 9, provides that there is no
obligation to make any payment in connection with any Claim:

brought about or contributed to in fact by any personal profit or advantage
gained by the Insured(s) to which it was not legally entitled[.]  (AUMF No. 22.)

### 2.     Federal's Excess Policy

Except as otherwise provided therein, the Excess Policy follows the terms,
conditions and exclusions of the Primary Policy.  The Excess Policy is conditioned on
exhaustion of the Primary Policy.  (AUMF No. 23.)

## B.     **Background**

### 1.     Boskovich Acquired a Total of 500 Shares of Stock Prior to and During His Employment with Aletheia

Eichler began to manage Boskovich's money in 1980, and Eichler, along with
Peiken, formed Aletheia, an investment management company, in 1997.  When
Aletheia was formed, Boskovich purchased 67 shares and became a founding
shareholder and, also, a client of Aletheia.  (AUMF No. 24.)

As confirmed in a May 23, 2001 letter from Aletheia to Boskovich, Aletheia
hired Boskovich as its Vice Chairman with his employment commencing on

4

FEDERAL'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   November 1, 2001, at an annual salary of $250,000, plus incentives including the

2   option to purchase warrants to buy stock in Aletheia.  (AUMF No. 25.)  On

3   December 20, 2001, after only seven weeks of employment, Boskovich and Aletheia

4   entered into a "Buy-Sell Agreement" and Boskovich purchased an additional 150

5   shares for $187,500.  (AUMF No. 26.)  The Buy-Sell Agreement specifies how

6   Boskovich could sell his shares in Aletheia.  Generally, if during his employment

7   Boskovich had a third-party buyer for some or all of his shares, Aletheia (or its other

8   shareholders) had a right of first refusal to purchase the shares for the same price.  If

9   Boskovich was no longer an employee, Aletheia and the other shareholders had the

10  right to purchase the shares at pro rata of 100% of the Aletheia's book value ($1,250

11  per share), or for a 20% premium to Boskovich's average cost per share, whichever

12  was greater.  (AUMF No. 27.)  Also, per the warrants granted for new client revenue

13  Boskovich brought in between 2002 and 2004, he acquired an additional 24 shares for

14  $30,890.  (AUMF No. 28.)

15          In 2004, and at a time when a company named Old Mutual expressed some

16  interest in acquiring shares in Aletheia, Boskovich stated that he wanted to acquire a

17  total of 500 shares, and Aletheia agreed.  (AUMF No. 29.)  On October 6, 2004,

18  Boskovich and Aletheia entered into a "Stock Purchase Agreement" pursuant to which

19  Boskovich purchased an additional 259 shares for the amount of $330,225, increasing

20  his total shares to 500.  The Stock Purchase Agreement was limited to just this stock

21  purchase, but it contained an "integration clause."  (AUMF No. 30.)

22                    2.      Sale of Aletheia Shares at Market Value

23          In November, 2006, Boskovich and other shareholders sold 10% of their

24  holdings to Proctor Investment Management ("Proctor")—Boskovich sold 50.03

25  shares at **$49,246** per share, for a total of $2,463,777.38.  (AUMF No. 31.)

26          In the Boskovich Action (*infra*), in order to establish the market value of his

27  shares, Boskovich alleged that on February 2, 2007, Aletheia repurchased certain

28  shares on February 2, 2007 for **$50,000** per share.  According to Stock Purchase

1   Agreements dated February 2, 2007, Aletheia purchased 23.4 shares from David and

2   Elizabeth Hasbrouck at the price of **$50,000** per share on that date.  (AUMF No. 32.)

3   Boskovich further alleged that on October 5, 2007, Aletheia repurchased shares from

4   another investor for **$60,000** per share.  According to a Stock Purchase Agreement

5   dated October 8, 2007, Aletheia purchased 4 shares of stock from Loran Graham at

6   the price of **$60,000** per share on that date.  (AUMF No. 33.)  Finally, Boskovich

7   alleged that in the summer of 2008, Aletheia was negotiating the repurchase of 5

8   percent of the Aletheia shares from Proctor, at a price of **$120,000** per share.  A

9   Summary of Terms and Conditions Between Proctor and Aletheia supports

10  Boskovich's allegation.[2]  (AUMF No. 34.)

            3.    Aletheia Terminates Boskovich and Attempts to Buy Boskovich's
11                Shares at Book Value

12

13          On July 9, 2008, Boskovich's employment was terminated by Aletheia.

14  (AUMF No. 35.)  At the time of his termination (and in the months thereafter),

15  Aletheia offered to repurchase Boskovich's shares at book value for $1,610.49 per

16  share (including the 20% premium), for a total of $729,068.82.  Boskovich was also

17  offered $10 million in exchange for a non-compete agreement.  Boskovich did not

18  accept either offer and retained his shares.  (AUMF No. 36.)  Boskovich concluded

19  that he did not deserve to be fired, and that his employment was terminated solely to

20  frustrate his ability to sell his shares on the open market.  (AUMF No. 37.)

21          In October 2008, Boskovich started a new investment-management firm named

22  Old West with a salary of $500,000.  (AUMF No. 38.)

23  **C.    The Boskovich Action**

24          On September 17, 2008, Boskovich filed an action against Aletheia entitled

25  *Joseph M. Boskovich v. Aletheia Research & Management, Inc.; and Does 1 through*

26  *50, inclusive,* Case No. BC39838 in the Superior Court of California, in and for the

27  County of Los Angeles ("Boskovich Action").  Boskovich alleged that his

28  _____

    [2] This transaction did not close.

1   employment was terminated so that Aletheia could obtain his shares for less than fair

2   market value (this was confirmed by Aletheia in its trial brief and in correspondence

3   from Aletheia's coverage counsel).  Specifically, Boskovich alleged that the

4   restriction-on-sale provisions of the Buy-Sell Agreement were superseded by the

5   Stock Purchase Agreement and thus he should have been allowed to sell the shares for

6   market value at any time and in any manner, but the defendants prevented him from

7   doing so.  (AUMF Nos. 39–41.)  Aletheia denied these allegations, and in turn sued

8   Boskovich and others for theft of trade secrets (among other claims) after he started

9   Old West and allegedly used Aletheia's proprietary material in his new business

10  venture (collectively, "the Underlying Actions").

11      On March 30, 2009, the Third Amended Complaint ("TAC") was filed.  After

12  motions to dismiss and for summary judgment, the following causes of action

13  remained at the time of the settlement: (1) breach of employment contract – breach of

14  the implied covenant of good faith and fair dealing ("the First Cause of Action"); (2)

15  declaratory relief to declare the Buy-Sell Agreement unenforceable; (3) breach of

16  fiduciary duty; and (4) an accounting to determine the value of Boskovich's shares of

17  Aletheia.  (AUMF No. 42.)

18      **D.    HCC and Federal Reserve Rights as to the Boskovich Action and HCC Reimburses Defense Costs Under the Primary Policy**

19

20      The Boskovich Action was submitted to HCC for coverage under the Primary

21  Policy, and on March 9, 2009, HCC sent Aletheia correspondence advising that HCC

22  will reimburse defense costs subject to a reservation of rights, including the right to

23  deny coverage.  On October 16, 2009 and November 3, 2009, HCC sent supplemental

24  reservations of rights to Aletheia.  (AUMF No. 43.)

25      Federal was placed on notice for coverage of the Boskovich Action in June

26  2009.  Federal responded that its investigation was proceeding under a reservation of

27  rights which incorporated HCC's reservation of rights and which included all rights

28  and defense under the Excess Policy and applicable law.  On November 30, 2009,

1    Federal sent correspondence to Aletheia advising that Federal concurs with the

2    coverage positions set forth in the October 16, 2009 and November 3, 2009

3    correspondence sent on behalf of HCC, and incorporates the contents of that

4    correspondence by reference.  (AUMF No. 44.)

5          **E.**    **Settlement of the Boskovich Action**

6          On June 9, 2010, Boskovich issued a policy-limits settlement demand that

7    would expire in 7 days for the balance of the Primary Policy after payment of defense

8    costs, and the full limit of the Excess Policy, plus $1.5 million from Aletheia.  On

9    June 11, 2010, Aletheia demanded that HCC and Federal tender their limits, noting

10   that it was prepared to contribute the $1.5 million.  (AUMF No. 45.)

11         HCC agreed to pay the balance of the Primary Policy (net of defense costs

12   already paid).  By letter dated June 29, 2010, Federal agreed to pay the $5 million

13   Excess Policy limit subject to a full reservation of rights, expressly including the right

14   to recover all amounts paid as the settlement did not reflect a covered Loss (the

15   "Settlement Payment").  HCC similarly reserved rights.  (AUMF No. 46.)

16         On August 6, 2010, the parties to the Boskovich Action entered into a

17   Settlement Agreement and Release of Claims ("the Settlement Agreement").  The

18   total amount paid to Boskovich was ███████ : ███████ contributed by

19   HCC (representing the balance of the Primary Policy), $5,000,000 from Federal, ██

20   ████████████████████████████████████

21   ██████████████████████████████

22   █████████████████████████████████

23   ████████████████████ (AUMF No. 47.)

24   ███████████████████████████

25   ████████████████████████████████████

26   ███████████████████████████████████

27   ████████████████████████████████████

28   ██████████████████████████████ (AUMF

No. 48.)  On August 23, 2010, Federal confirmed that its limit of $5,000,000 under the Excess Policy had been wired.  The reservation of rights contained in the June 29, 2010 letter was repeated.  (AUMF No. 49.)

### F.      The Coverage Action

On November 3, 2011, Federal brought suit against Aletheia, alleging:  (1) it had no duty under the Excess Policy to indemnify Aletheia for the Settlement Payment because it constitutes uninsurable restitution and is otherwise barred from coverage; (2) an actual controversy exists with respect to these issues and Federal requests a declaration that it had no duty to indemnify Aletheia for the Settlement Payment; and (3) a claim for reimbursement for the amount of the Settlement Payment.  On December, 22, 2011, Aletheia filed a motion to dismiss.  On February 6, 2012, the Court denied the motion and held that Federal has stated a valid claim for reimbursement and met the requirements of *Blue Ridge.*  (ECF No. 41.)

## III.    ARGUMENT

### A.      Aletheia Has Failed to Meet its Burden of Proving Facts That Bring the Settlement Payment Within Coverage

Aletheia bears the burden of proving facts establishing that the Settlement Payment falls within the coverage provided by the Policies' insuring clauses.  *Aydin v. First State Ins. Co.*, 18 Cal.4th 1183, 1188 (1998).  Aletheia has failed to meet this burden as the majority of the evidence relied upon by Aletheia is based on inadmissible and irrelevant hearsay statements made at a confidential mediation and the opinions of counsel.  Aletheia has failed to demonstrate that the Settlement Payment constitutes an insurable Loss.  Since Aletheia has failed to meet its burden of establishing that the Settlement Payment is a covered Loss, its motion for summary judgment must be denied.

### B.      Aletheia's Motion Is Based Upon a Misunderstanding of the Relevant Law Regarding the Obligations and Duties of an Insurer

Aletheia argues, incorrectly, that because Boskovich sought "damages" in his

action for wrongful termination (and not "restitution"), it was a covered claim, and therefore, any settlement of that action would also be covered. Aletheia's reliance on this argument is misplaced and, for the reasons discussed below, appears to be based upon a fundamental misunderstanding of the duties of an insurer under California insurance law.

In California, it is well-established that while an insurer has a duty to defend so long as there is a mere potential for liability under the policy (*Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 276–77 (1966)), an insurer's duty to indemnify is not as broad (*Buss v. Super. Ct.*, 16 Cal.4th 35, 46 (1997)). Therefore, "[a]lthough an insurer may have a duty to defend, it ultimately may have no obligation to indemnify, either because no damages were awarded in the underlying action against the insured, *or because the actual judgment was for damages not covered under the policy*." *Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.*, 10 Cal.4th 645, 660 n.9 (1995).

The California Supreme Court has held that "the insurer only has a duty to indemnify the insured for covered claims, and no duty to pay for noncovered claims because the insured did not pay premiums for such coverage." *Blue Ridge*, 25 Cal.4th at 503 (*citing Buss*, 16 Cal.4th at 50–51). In analyzing an insurer's duty to indemnify, California courts looks to the nature of the indemnity obligation – irrespective of whether it was labeled "damages" or "restitution" – to determine whether the payment was insurable. *Bank of the West v. Super. Ct.*, 2 Cal.4th 1254, 1270 (1992) ("We did hold in *AIU* that insurable 'damages' include monetary awards that represent compensation for harm to third parties, even if such awards bear the label 'restitution.'"); *see also Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 911 (7th Cir. 2001) ("How the claim or judgment order or settlement is worded is irrelevant.").

Here, Aletheia recites a slew of factual statements allegedly "not disputed in this case" in support of its argument that the Settlement Payment is covered because Boskovich sought "damages" in his underlying action for wrongful termination. (ECF

No. 56, 8:27–10:15.)  While Federal takes issue with Aletheia's characterization of these statements (see Federal's Response to Aletheia's Separate Statement), this argument is misplaced.  It is the nature of the Settlement Payment, and not the characterization of the allegations, that determines Federal's *indemnity* obligation.

Further, Aletheia attempts to support the proposition that a claim seeking only "special or general damages" is dispositive of whether the claim is for restitutionary loss by citing several cases which do not apply and or are readily distinguishable. *Genzyme Corp. v. Federal Insurance Co.*, 622 F.3d 62 (1st Cir. 2010) does not address this issue, but instead held that because the insured had not acquired anything – it simply reorganized its shares and acquired a right to cancel tracking stock – it had nothing to disgorge, therefore, the public policy against insuring restitutionary payments did not apply. Similarly, *Federal Insurance Co. v. Arthur Andersen, LLP*, No. 03 C 1174, 2005 U.S. Dist. LEXIS 15706 (N.D. Ill. Aug. 2, 2005) did not address this issue, but held that the public policy against insuring restitutionary payments did not apply because the insured, unlike Aletheia, had not acquired anything to be disgorged.  In *Chubb Custom Insurance Co. v. Grange Mutual Casualty. Co.*, No. 2:07-cv-1285, 2011 U.S. Dist. LEXIS 111583 (S.D. Ohio Sept. 29, 2011), the insured was alleged to have used computer software "to evaluate and underpay what their insureds were entitled to recover as general damages for bodily injury," the settlement of which was not restitution because, unlike Aletheia, the insured had not acquired anything from the claimants.  Lastly, *United Western Grocers, Inc. v. Twin City Fire Insurance Co.*, 457 F.3d 1106 (9th Cir. 2006), does not apply because the court likely considered "whether the claim seeks to recover only the money or property that the insured wrongfully acquired" to determine whether there was a *defense* and not an *indemnity* obligation as the insureds sought both defense costs and reimbursement of losses.

Finally, Aletheia's attempt to argue that HCC and Federal "admit coverage" is incorrect because an acknowledgement subject to a reservation of rights that the

1   Boskovich Action may constitute a covered claim for *defense* purposes does not result

2   in coverage for *indemnity*.  Rather, the nature of the settlement governs an insurer's

3   *indemnity* obligation, and it is common for an insurer (as Federal did here) to

4   acknowledge a potential *defense* obligation while reserving rights with respect to

5   coverage for *indemnity*.  Further, whether Boskovich sought restitution in his

6   complaint, or whether the words "restitution" or "disgorgement" appear in the

7   Settlement Agreement, is not dispositive of whether the Settlement Payment

8   constitutes restitution or other uncovered loss.  The Settlement Payment simply falls

9   outside the scope of coverage.

10       **C.**    <u>**Coverage Does Not Exist for the Settlement Payment Because It Does Not Constitute Insurable Loss**</u>

11
12          1.    <u>The Settlement Payment Is Uncovered Restitution Because It Represents Amounts that Boskovich Was Entitled to in the First Instance, Which Is Not Insurable</u>

13

14       The Primary Policy's definition of "Loss" specifically excludes "(3) matters

15   deemed uninsurable under the law pursuant to which this Policy shall be construed;

16   [and] (7) the return or restitution of any money, assets or personal profit received by

17   any Insured(s) to which such Insured(s) is not legally entitled[.]"

18       Courts have consistently held that restitution is not insurable as a matter of law,

19   and, thus, it does not constitute "Loss" under directors and officers insurance policies.

20   *Pan Pac. Retail Props., Inc. v. Gulf Ins. Co.,* 471 F.3d 961 (9th Cir. 2006); *Level 3*

21   *Commc'ns*, 272 F.3d at 910; *Bank of the West*, 2 Cal.4th at 1266.  Here, Boskovich

22   was seeking that to which he was entitled under the Buy-Sell Agreement, and which

23   Aletheia was legally obligated to pay.  The settlement represented a compromise of

24   that claim.

25       In *Level 3*, two former officers sued Level 3 to obtain what they contended

26   were improper gains acquired by Level 3 in a merger agreement.  The insured settled

27   with the former officers and looked to its D&O insurer for reimbursement.  Federal,

28   the insurer, declined payment on the ground that the settlement was not a "Loss"

within the meaning of the policy.  The policy defined loss as "the total amount which

any Insured Person becomes legally obligated to pay . . . including but not limited to .

. . settlements."

The Seventh Circuit found the nature of the settlement was a form of restitution

that did not constitute loss under the policy.  272 F.3d at 910.  The court distinguished

damages from restitution.  "The interpretive principle for which Federal contends –

that a 'loss' within the meaning of an insurance contract does not include the

restoration of an ill-gotten gain – is clearly right."  *Id.* at 910.  The court noted: "How

the claim or judgment order or settlement is worded is irrelevant.  An insured incurs

no loss within the meaning of the insurance contract by being compelled to return

property that it had stolen, even if a more polite word than 'stolen' is used to

characterize the claim for the property's return."  *Id.* at 911.

The Ninth Circuit cited *Level 3* approvingly in *Pan Pacific Retail Properties,*

471 F.3d 961.  In *Pan Pacific*, a case more akin to the instant action, where two

corporations proposed a merger, shareholders in the target corporation filed a lawsuit

against the acquiring corporation, alleging that its officers and directors had

undervalued shares in the target corporation.  The lawsuit was tendered to the

corporation's D&O insurer under a policy which excluded "any award against or

settlement by [the Insured] representing increased consideration for its acquisition."

The lawsuit was settled and the insured sued for coverage.  The District Court granted

the insurer's motion for summary judgment on the grounds that the settlement

involved restitution.

Although the Ninth Circuit found a triable issue of fact (on which components

of the settlement were or were not "restitution") and thus remanded back to the

District Court, the Court of Appeals held that "[the] derivative claim would

necessarily seek to divest money that was improperly obtained or withheld [by the

insured].  Any payments intended to settle these claims would be uninsurable as

seeking to recover the net benefit of the alleged wrongful acts committed by [the

insureds].” *Id.* at 968.  Further, the court noted that:

> Regardless of whether Pan Pacific actually breached a fiduciary duty or committed a wrongful act, if Pan Pacific made a payment to settle a claim that sought the return of wrongfully acquired property as defined by California law, such a payment would be on behalf of a claim that was uninsurable as a matter of public policy and thus not covered by insurance.

*Id.* at 968 n.5.

Here, Boskovich entered into an agreement with Aletheia to purchase shares (AUMF No. 26.), which provided that, if during his employment Boskovich had a third-party buyer for some or all of his shares, Aletheia (or its other shareholders) had a right of first refusal to purchase the shares for the same price.  (AUMF No. 27.)  If Boskovich was no longer an employee, Aletheia and the other shareholders had the right to purchase the shares at pro rata of 100% of the company's book value, or for a 20 percent premium to Boskovich's average cost per share, whichever is greater.  (*Id.*)  Boskovich alleged that he was terminated by Aletheia in order to prevent him from selling his shares on the open market, so that Aletheia could obtain his shares for less than fair market value.  (AUMF No. 39.)  There is no dispute that in November 2006, February 2007 and October 2007, dates all within 24 months of Boskovich's termination, Aletheia's shares were sold or purchased for $49,246 per share, $50,000 per share, and $60,000 per share, respectively, far in excess of what Aletheia offered Boskovich.  (AUMF Nos. 31–33.)

Boskovich alleged in the TAC and testified that he would have been able to sell his shares on the open market had Aletheia not terminated his employment and frustrated his ability to sell the shares.  (AUMF No. 39.)  That is, Boskovich sought to recover sums to which he would have been entitled in the first instance under his contract.  As stated in Aletheia's March 18, 2010 trial brief with respect to the First Cause of Action: “The essence of this claim is that Boskovich was deprived of his alleged right to realize ‘market value’ for his Aletheia stock.”  Also, with respect to

1   Boskovich's breach of fiduciary duty cause of action, Aletheia's trial brief alleged:

2   "Boskovich claims that the Aletheia Parties breached their fiduciary duties by

3   committing 'acts intended to deprive [Boskovich] of the opportunity to receive the full

4   fair market value of his stock in Aletheia . . . ." (AUMF No. 40.)  Aletheia's coverage

5   counsel confirmed this fact in her June 11, 2010 letter:

6           [Boskovich's] damages claim is a supposed lost business opportunity of selling

7           his stock for "market value" which he contends is $20 to $30 million.   The

8           claim is that his termination prevented Boskovich from selling his stock at

9           market value since once he is no longer employed by the company, Aletheia has

10          a right to purchase his stock at book value according to the contract Boskovich

11          signed when he purchased his shares.  (AUMF No.41.)

12          As such, the clear intent of the settlement was to compromise Boskovich's

13  claim for what he was entitled to in the first instance.   The Settlement Payment was

14  not compensation for Boskovich's alleged wrongful termination, but represented

15  compromise of what he was due under his contract.[3]  Aletheia also argues that

16  Boskovich's alleged loss did not correspond to a benefit retained by Aletheia, which is

17  the "*sine qua non*" of restitution.  However, the Settlement Payment was recompense

18  for the business opportunity ████████████████████████████ that

19  Aletheia misappropriated when it terminated Boskovich's employment, and as such is

20  barred from coverage.  ███████████████████████

21          2.       ███████████ rit to Aletheia's Argument that Boskovich's
                     ███████████ was Part of the Settlement of Both Boskovich's

22                   Claims

23          There is no merit to Aletheia's argument that Boskovich's ██████████ was

24  part of the settlement of both Boskovich's and Aletheia's claims, ████████████

25

---

26          [3] At the time of his termination ██████████ was in his mid-60s and was making an
    annual salary of $250,000.  If the ██████████ settlement truly reflected lost income
27  due to being wrongfully terminate ██████████ have represented that Boskovich would
    have continued to work at Aletheia for another 34.4 years.  This also makes no sense as
28  Boskovich immediately set up a competing company and paid himself $500,000
    annually.  (AUMF No. 38.)

1 ███████████ in exchange for "Aletheia's release and dismissal of its claims against

2 Boskovich – additional valuable consideration." (ECF No. 56, 19:2–20:7.) Aletheia

3 offers no evidence to support this claim, and Federal notes that the terms of the

4 settlement are essentially the same as the severance package offered to Boskovich at

5 the time of his termination and before Aletheia's trade secrets claims were asserted –

6 approximately $11 million in exchange for the return of Boskovich's shares.

7     In addition, further analysis of the settlement of Boskovich's claims proves that

8 ████████████████████████████ Even if we assume that the

9 ███████ settlement was compensatory damages for Boskovich's wrongful

10 termination as Aletheia contends, Boskovich would have only been entitled to lost

11 wages and benefits for the two to three months he was unemployed before he started

12 Old West and began paying himself an annual salary of $500,000. Boskovich would

13 not have had any loss of future wages or benefits due to his income from Old West.

14 Therefore, unless Boskovich had been earning nearly $3 million per month at Aletheia

15 (which he was not), compensatory damages cannot account for the ████████

16 settlement.

17     Aletheia also asserts that Federal is seeking a double recovery by seeking the

18 return of its Settlement Payment and ███████████████████████

19 ███████ This is not true. Federal's complaint seeks, in the alternative to return of

20 its Settlement Payment, █████████████████████████

21 ███████ and Federal's counsel has so advised Aletheia's counsel.[4] Also, since

22 there is no evidence that ████████████ was for settlement of Aletheia's

23 claims against Boskovich, there is no merit to Aletheia's argument that Federal's

24 claim is barred by the "no set off" rule.

25       3.  The Case Law Cited by Aletheia Confirms that Public Policy Bars

26           Coverage for the Settlement Payment

27     Aletheia applies an extremely narrow interpretation of California's public

28

---

[4] 58% represents the ratio of Federal's payment to the overall settlement.

1    policy against insuring restitution, arguing that it only applies in instances of fraud, or

2    for violation of statutes that provided for disgorgement or impose remedies designed

3    for the purpose of punishment or deterrence.  However, as Aletheia itself

4    acknowledges, the genesis of this public policy in *Jaffe v. Cranford Insurance Co.*,

5    168 Cal.App.3d 930 (1985) is based on those circumstances "in which the defendant

6    is required to restore to the plaintiff that which was wrongfully acquired."  Here,

7    Aletheia's motion acknowledges (ECF No. 56, 4:7–11) and the evidence shows that

8    Boskovich's loss was limited to his "lost business opportunity to sell his Aletheia

9    shares (which he had received as part of his compensation) at market price[.]"  It is

10    this business opportunity ██████████████████████

11    that Aletheia allegedly misappropriated.  Because the Settlement Payment represented

12    a compromise of these claims, it constitutes uninsurable restitution.  This does not

13    change simply because California courts have held that public policy bars coverage

14    for restitution to victims of crime (*State Farm Fire & Cas. Co. v. Super. Ct.*, 191

15    Cal.App.3d 74 (1987)), or for legal fees and treble damages under RICO (*Krasner v.*

16    *Prof'l Prototype I. Ins. Co.*, No. 91-55985, 1993 U.S. App. LEXIS 564 (9th Cir. Jan.

17    13, 1993)), or that they have held that reimbursement of environmental response costs

18    is not restitutionary in nature (*AIU Ins. Co. v. Super. Ct.*, 51 Cal.3d 807 (1990)).

19          Aletheia further cites to out-of-jurisdiction case law in support of its position

20    that courts have rejected "the restitutionary loss doctrine" in insurance policies which

21    cover "damages," as opposed to "loss".   These non-binding authorities – which have

22    not been cited by any California court – do not stand for such a sweeping proposition,

23    and, instead, simply hold that coverage for the type of recovery sought therein is not

24    barred by this public policy consideration.

25        **D.**     **The Settlement Payment Is Barred by the Policies' Exclusions**

26             1.     The Settlement Constitutes Liability Arising Under Contract

27                  Which Is Barred From Coverage Under Exclusion G.

28          Boskovich alleged that he sought to recover the monies he would have received

had he been able to sell his shares of stock on the open market pursuant to the Buy-Sell and Stock Purchase Agreements.  (AUMF No. 39.)  As such, the Settlement Payment necessarily constitutes "liability of any Insured(s) arising under a contract or agreement," which is excluded from coverage pursuant to Exclusion G.  Aletheia would have had no potential liability but for these contracts.

Aletheia's argument that specific policy terms take precedent over more general terms, citing to a general rule of contract interpretation that "when provisions are inconsistent, specific terms control over general ones", does not apply because this is not a matter of "inconsistent" contract provisions.  Here, Exclusion G. serves to limit the scope of coverage, even for certain Wrongful Employment Practices.

Aletheia's alternative argument that the exception to Exclusion G. (exclusion shall not apply to liability which would attach even in the absence of a contract) applies because the settlement included Boskovich's breach of fiduciary duty claim, which was made in his capacity as a minority shareholder and independent of his employment agreement, also fails.  Boskovich purchased the majority of his shares pursuant to the Buy-Sell Agreement and the Stock Purchase Agreement.  (AUMF Nos. 26, 30.)  As such, Aletheia would not have had any liability but for its contracts with Boskovich.  In sum, the Settlement Payment is excluded pursuant to Exclusion G.

### 2.    Coverage Is Barred Under Exclusion E.

Under Exclusion E., coverage is excluded in connection with any claim in which there was "any personal profit or advantage gained by the Insured(s) to which it was not legally entitled".  Here, Boskovich alleged that the defendants breached their fiduciary duty to Boskovich "In attempting to gain control of Plaintiff's stock at less than market value, by terminating Plaintiff for the purpose of attempting to gain control of his stock, by ignoring the terms of the Stock Purchase Agreement in their dealings towards Plaintiff as well as in generally treating Plaintiff as a minority shareholder in a manner designed to benefit themselves at Plaintiffs expense[.]"  Such

1  conduct constitutes "advantage gained by the Insured(s) to which it was not legally

2  entitled."  Also, as noted above, the Settlement Payment, which represents a sum

3  which Boskovich would have been entitled in the first instance, was made in exchange

4  for ████████████████████████████  Under these circumstances,

5  ████████████████████████████ constitutes "personal profit or

6  advantage gained by the Insured(s) to which it was not legally entitled."  Therefore,

7  the Settlement Payment made in connection with the settlement was, in fact, the return

8  by Aletheia of money or profit to which it was not legally entitled because Aletheia

9  was returning to Boskovich the amount that he would have been entitled to under his

10  contract but for its alleged wrongful conduct.

11  **IV.   ALETHEIA CANNOT RE-ARGUE THAT "FEDERAL SHOULD BE BOUND BY HCC'S ADMISSION OF COVERAGE" BECAUSE ALETHEIA RAISED THIS ISSUE IN ITS MOTION TO DISMISS AND THE COURT DETERMINED THAT FEDERAL PROPERLY RESERVED AND STATED A CLAIM FOR REIMBURSMENT**

14  In its motion to dismiss, Aletheia argued that "FEDERAL IS BOUND BY

15  HCC'S ADMISSION OF COVERAGE".  (ECF No. 18, 7:19–8:19).  Federal filed an

16  opposition that responded to this issue (ECF No. 20, 12:11–16:25), and Aletheia had a

17  further opportunity to address this issue in its reply.  (ECF No. 26.)  On February 6,

18  2012, this Court issued an order denying Aletheia's motion.  (ECF No. 41.)  The

19  order, in part, noted that the Court considered the facts set forth in Federal's

20  complaint, found that they "sufficiently establish Plaintiff's right to state a claim for

21  reimbursement of non-covered claims", and held that "Plaintiff has also met the

22  requirements of *Blue Ridge*."  (ECF No. 41.)

23  In the pending motion, Aletheia, apparently wanting a second bite of the apple,

24  asserts that "Federal Should be Bound by HCC's Position that the Payments Under the

25  Settlement Agreement Represented an Insurable Loss", and makes the exact same

26  arguments and cites the exact same authority in its motion to dismiss.  (ECF No. 56,

27  21:15–22:18.)  Aletheia provides no authority to support the proposition that, if a

28  party is not satisfied with the court's initial ruling on an issue, it has the right to re-

1  litigate the same issue that has already been decided. In sum, Aletheia has provided

2  no authority to show it is entitled to a second bite of the apple and Aletheia's motion

3  with respect to this issue must be denied. Should this Court be inclined to re-visit

4  whether Federal has the right to pursue its claim for reimbursement, Federal

5  respectfully requests an opportunity to submit additional briefing on this issue.

6  **V.      PROCEDURAL ISSUES REGARDING ALETHEIA'S MOTION**

7           Federal opposes Aletheia's motion on the grounds that Aletheia has

8  misrepresented its compliance with Local Rule 7-3's meet and confer requirement as

9  counsel did not discuss the merits of its motion on March 15, 2012 as indicated in

10  Aletheia's Notice of Motion. (See Harrison Decl. ¶ 14.) In addition, Aletheia failed

11  to comply with the Court's 20-page limit for motions.

12  **VI.     FEDERAL'S RULE 56(D) MOTION**

13          For the reasons set forth in the accompanying Harrison Decl., Federal

14  respectfully makes a request to this Court under Fed. R. Civ. P. 56 (d) to deny

15  Aletheia's motion; in the alternative, Federal requests that the Court defer considering

16  Aletheia's motion until after discovery is complete and Federal's motion for summary

17  judgment has been filed.

18  **VII.    <u>CONCLUSION</u>**

19          For the foregoing reasons, Federal respectfully requests that the Court deny

20  Aletheia's motion for summary judgment.

21  DATED: May 14, 2012                    SEDGWICK LLP

22
                                          By: _____
23
                                             BRIAN D. HARRISON
24                                           Attorneys for Plaintiff
                                             FEDERAL INSURANCE COMPANY
25

26

27

28